**ΠIN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **Franklin Edwards,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:18-00293-JB-N** |
| | ) | |
| **City of Selma,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant the City of Selma's ("Selma") Motion for Summary Judgment ("Motion") and Brief in Support (Doc. 15 & Doc. 16), Plaintiff Franklin Edwards' Response in Opposition (Doc. 18), and Selma's Reply. (Doc. 19). The Motion is ripe for review. After careful consideration, the Court **GRANTS** Selma's Motion for the reasons set forth herein.

**BACKGROUND**

This is a civil rights case. Plaintiff ("Edwards"), an African American man, works in the Selma Fire Department. Plaintiff alleges that his former supervisor, former Fire Chief Toney Stephens ("Stephens"), also an African American man, implemented racially discriminatory promotional procedures that precluded Plaintiff's advancement within the fire department in violation of the 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment. Specifically, Plaintiff alleges that Stephens carried out a policy whereby promotions to various "Chief-level" positions in the Department were done on a racially consistent basis; when one position was vacated by a member of one race, Stephens would recommend a candidate of the

same race to fill that vacancy. For instance, if a position was vacated by a white person, Stephens would recommend a white applicant to fill that position, eliminating Plaintiff from consideration for the position due to his race.

Plaintiff also alleges that the City violated his Fourteenth Amendment Due Process rights when he was twice suspended without pay and was not afforded an appellate procedure to dispute his alleged misconduct. Plaintiff argues that the instances of misconduct resulting in his suspension were the result of Stephens abusing his power as Fire Chief and that they were used as pretext to prevent him from receiving a promotion within the Selma Fire Department.

**SUMMARY JUDGMENT STANDARD**

"'Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted). If that standard is met, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quotation marks omitted).

To prevent summary judgment, a factual dispute must be both material and genuine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A fact is 'material' if it has the potential of 'affect[ing] the outcome' of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quotation marks omitted). And to raise a 'genuine' dispute, the nonmoving party must point to enough evidence that 'a reasonable jury could return a verdict for [him].' *Id."* *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (2018).

## DISCUSSION

### I. PLAINTIFF'S BARE-BONES "§ 1981" CLAIM CAN BE TRANSFORMED INTO A VALID 28 U.S.C. § 1983 CLAIM BECAUSE IT "BEARS THE HALLMARKS OF A § 1983" CLAIM.

Selma argues it is due summary judgment because Plaintiff's claim for racial discrimination is under the Equal Protection Clause and 42 U.S.C. § 1981, which provide no viable cause of action. Specifically, Selma argues that because Plaintiff failed to invoke 42 U.S.C. § 1983, and relies only on § 1981, he cannot move forward on his discrimination claims. Selma directs the Court to, *inter alia*, *Taliaferro v. Conecuh County,* 2005 WL 8158706 (S.D. Ala. 2005), from which it highlights the following excerpt: "Both the Equal Protection Clause and § 1981 claims can only be brought and enforced through 42 U.S.C. § 1983." Ultimately, Selma's argument here is unpersuasive and, as Plaintiff points out, the Eleventh Circuit has more recently spoken to this precise issue.

In *King v. Butts County,* 576 Fed. Appx. 923, *930 (11th Cir. 2014), the Eleventh Circuit also faced a pleading issue concerning a § 1981 claim that should have been brought under § 1983. Like Edwards, the plaintiff in that case failed to cite § 1983 as the statutory provision under which he sought redress. The district court dismissed those claims for the reasons argued by Selma now. However, on appeal, the Eleventh Circuit reversed, analogizing the plaintiff's claims to his other Title VII claims in that lawsuit, noting that the plaintiff had complained that the defendant's conduct was

> . . . accomplished under the color of state and local law and that those actions affected his federally-protected rights – both of which are hallmarks of a § 1983 claim. Thus, because King gave Butts County fair and sufficient notice of the nature of and grounds for his § 1983 claim, . . . he may proceed under § 1983 . . .

*Id.* at 931.

In his Complaint, Plaintiff makes several allegations in an attempt to hold Selma liable for racial discrimination, including:

> Plaintiff was employed as a firefighter by the Selma Fire Department beginning in 2004, and thereafter, was promoted to Engineer and Captain in 2004 and 2007, respectively;
>
> The Mayor of Selma is responsible for making five (5) appointments in the Selma Fire Department, those being: Fire Chief, Assistant Chief, and three Battalion Chief positions. The Selma Fire Department's Fire Chief's recommendations are significantly influential to the mayor's ultimate decisions in these appointments;
>
> That former Fire Chief Toney Stephens made promotional recommendations based upon the race of those vacating positions and applicants, effectively "keep[ing] the racial demographics of the appointments intact; and
>
> In 2016, Plaintiff was passed over for a battalion chief position for a less qualified white applicant. The exiting battalion chief was white. In the summer of 2017, Plaintiff was again passed over for an Assistant Chief position for a less qualified white employee. The exiting Assistant Chief was White. In [*sic*] or about March 2018, two battalion chief positions came [*sic*] available. One was previously held by a Caucasian. Plaintiff was not hired . . . The position which was previously held by the Caucasian employee was filled by a Caucasian on or about May 29, 2019. These were consistent with the Chief's unwritten policy of maintaining the racial demographic *status quo*. Since the Chief Stephens's hiring [*sic*], every vacancy of appointment positions [*sic*] has been filled in this manner.

(Doc. 1 at 1 – 3). From these allegations, it is clear that Plaintiff claims that Stephens made promotional recommendations to the Mayor based on a racially discriminatory policy and did so under the color of state and local law. Notwithstanding Selma's objections (Doc. 19 at 4),[1]

[1] Defendant argues that Plaintiff's Complaint does not "bear the hallmarks of a § 1983 complaint" because "nowhere in the Complaint is it alleged that individual actors acted under the color of state law . . ." (Doc. 19 at 4). However,

Plaintiff's Complaint bears the hallmarks of a § 1983 claim and puts Selma on notice of the nature of and grounds for his claim, i.e., that Selma allowed Stephens to set municipal policy and make final decisions for the Fire Department's promotions and that Selma is liable for Stephens' action. Additionally, Plaintiff's allegations are akin to those found sufficient by courts in this Circuit and elsewhere. *See, e.g., Willingham v. City of Valparaiso,* 97 F. Supp. 3d 1345, 1352 (N.D. Fla. 2015) ("From these facts, the City was on notice that Mr. Willingham believed it liable for the actions of the Mayor . . ."); *Reynolds v. Ark. Dep't of Corr.,* No. 5:07CV00168 JLH, 2008 U.S. Dist. LEXIS 55667, at *8 (E.D. Ark. July 21, 2008) ("Similarly, this Court liberally construes Reynolds's complaint as alleging violations of § 1981 under § 1983."); *Dockery v. Unified Sch. Dist. No. 231*, 406 F. Supp. 2d 1219, 1224-25 (D. Kan. 2006) ("The court finds defendants' argument that the court should dismiss this claim solely for that reason to be without merit in light of the liberal notice pleading standards of the Federal Rules of Civil Procedure. [. . .] § 1983 creates no substantive rights, but rather creates only a remedy against those who, acting under color of law, violate rights secured by federal statutory or constitutional law. [. . .] § 1981 creates the statutory right for Mr. Dockery's discriminatory discharge claim and § 1983 provides the exclusive remedy for the alleged violation of his statutory right.") (internal citations and quotations omitted).

---

the lenient standard provided in Fed. R. Civ. P. 8, combined with *King*, leads the Court to disagree. It is true that Plaintiff did not state in his Complaint that Stephens acted under the color of state and local law in order to allegedly effectuate his discriminatory promotional policy. However, the following question is begged: "How else, but for the authority granted by local and state law, was former Chief Stephens able to *at least* make recommendations to the Mayor as outlined in Plaintiff's Complaint?" Also, Plaintiff alleges the Mayor's ultimate municipal authority to make appointments, which places Stephens' recommendation in context.

Defendant also argues that there is no individual defendant named in the Complaint. Defendant acknowledges in its Motion, though, that Plaintiff is seeking relief pursuant to an alternative theory of liability by which naming an individual defendant would not be necessary. (*See* Doc. 16 at 11, 12). Defendant's final contention, that "the Complaint does not allege that the individual with an alleged racial bias was the 'final policymaker'" is the most plausible contention. The Court shall address this *infra*.

The issue of whether Plaintiff has *satisfied* the *McDonnell Douglas* standard for establishing a *prima facie* case of discrimination, and other issues concerning whether Stephens was a final policymaker related to Fire Department promotions, are addressed below. At this point, the Court only concludes that the facts contained in the Complaint provide Selma notice that Plaintiff sought to vindicate his rights under § 1983. In sum, based on the foregoing allegations, Plaintiff's Complaint is imbued with the hallmarks of a § 1983 claim as described in *King* and his Complaint should be treated as one in which he seeks redress of a violation of § 1981 "under" § 1983.

## II. DEFENDANT IS DUE SUMMARY JUDGMENT ON PLAINTIFF'S EQUAL PROTECTION CLAIM.

It is undisputed that Plaintiff has no direct evidence of discrimination. (*See, e.g.*, Doc. 18 at 14). Therefore, in order the prevail on his Equal Protection claims, Plaintiff must make a showing of circumstantial evidence that satisfies the test in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), which identified the necessary elements to establish a *prima facie* violation when an employee "loses out" to another applicant competing for a promotion. *See also Crawford v. Western Electric Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980). The elements of a *prima facie* showing include:

> (1) [plaintiff] is a member of a protected class;
> (2) he sought and was qualified for positions that [the defendant employer] was attempting to fill;
> (3) that despite his qualifications he was rejected; and
> (4) that after his rejection [the defendant employer] either continued to attempt to fill the positions or in fact filled the positions with [persons outside the plaintiffs' protected class].

*Harrington v. Disney Reg'l Entm't, Inc.,* 276 F. App'x 863, 872-73 (11th Cir. 2007); *see also Walker v. Mortham*, 158 F.3d 1177, 1187 (11th Cir. 1998) (noting that erroneous *dicta* requiring a plaintiff to show that the promoted employee had "equal or lesser qualifications" had entered the Eleventh Circuit's articulation of the standard, and reiterating that *Crawford* governs); *see also Harrington,* 276 F. Appx 863, 874 ("Appellants argue, correctly, that Harrington and Laney should not have been required to prove that the successful applicant for the promotion, Heinzman, was less or equally qualified. Rather, Heinzman's alleged superior qualifications should have been understood instead as a rebuttal to the initial presumption of discrimination that appellants would then need to show to be pretextual.").[2]

If a plaintiff establishes a *prima facie* case, then the burden "shifts to the employer to articulate a legitimate, nondiscriminatory reason for [the adverse employment action]. [. . .] If the employer does so, the burden shifts back to the plaintiff to 'introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.'" *Zaben v. Air Prods. & Chems.,* 129 F.3d 1453, 1457 (11th Cir. 1997) (internal citations omitted).

Furthermore, the City of Selma cannot be held liable for the acts of Stephens based on a theory of *respondeat superior*. *See Oladeinde v. City of Birmingham* 230 F.3d 1275, 1295 (11th Cir. 2000). If Plaintiff is to hold Selma liable, Plaintiff must prove that his claims resulted from one of the following: "(1) an official government policy; (2) a custom or practice so pervasive and well-settled that it assumes the force of law; or (3) the actions of an official fairly deemed to

---

[2] *See also, Houston v. Town of Palm Beach Shores*, No. 11-80530-CIV, 2012 U.S. Dist. LEXIS 167146, at *16-18 (S.D. Fla. Nov. 26, 2012) (discussing the intra-Circuit split concerning denial of promotion claims, concluding that plaintiffs do not have to show that they were equally or more qualified than other applicants.). This Court agrees with the *Houston* court's decision and follows the "earliest case" rule.

represent government policy." *Oladeinde* 230 F.3d at 1295 (*citing Denno v. School Bd. Of Volusa County*, 218 F.3d 1267, 1276 (11th Cir. 2000)(*citing Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978)).

Selma argues Plaintiff's Equal Protection claims fail as a matter of law because Plaintiff cannot prove municipal liability under this applicable § 1983 framework.

**A. The undisputed facts foreclose any material issue concerning an "official government policy."**

Selma argues that the first of the three alternatives for holding a municipality liable, i.e. proof of an "official government policy," is foreclosed by the undisputed fact[3] that its official promotional practices are governed by an equal opportunity and non-discrimination policy. The Court agrees. The undisputed fact of Selma's equal opportunity and non-discrimination policy prevents Plaintiff from basing liability on an "official government policy."

**B. There is no genuine issue of material fact of a custom or practice so pervasive and well-settled as to assume the force of law.**

To establish a custom or practice so pervasive and well-settled that it assumes the force of law, a plaintiff must show: (1) a persistent and wide-spread practice, and (2) actual or constructive knowledge of the custom by the governmental entity. *Guardino v. Halifax Health*, No. 6:18-cv-2035-Orl-41KRS, 2019 U.S. Dist. LEXIS 19338, at *9 (M.D. Fla. Jan. 10, 2019). To the extent Plaintiff's Equal Protection claims are based on the theory that Stephens' "demographic" rule of promotion constituted a custom or policy that was "so pervasive and well-settled that it assumed the force of law," those claims fail as a matter of law because there is no substantially

---

[3] *See* Doc. 18 at 8.

probative evidence that Selma had actual or constructive knowledge of it. Plaintiff's relevant allegations include the following:

> There are five appointments made by the mayor of Selma. Those are chief, assistant chief, and three battalion chief positions. The chief, once appointed, gives recommendations and has significant influence on the appointment of other positions. In or about Summer of 2015, Toney Stephens became chief of the Selma Fire Department. Shortly after his employment, he stated that he would keep the racial demographics for the appointments intact. The stated, but unwritten policy, for promotion to these appointments was that when an appointment position was vacated, it would be filled with an applicant of the same race as the existing employee ("white for white" and "black for black"). In 2016, plaintiff was passed over for a battalion chief position for a less qualified white applicant. The existing battalion chief was white. In the summer of 2017, Plaintiff was again passed over for an Assistant Chief position for a less qualified white employee. The existing Assistant Chief was white. In or about March, 2018, two Battalion Chief positions came [*sic*] available. One was previously held by a Caucasian. And the other position was previously held by an African American. Plaintiff was not hired for either position. The position which was previously held by the Caucasian employee was filled by Caucasian on or about May 29, 2018. These were consistent with the Chief's unwritten policy of maintaining the racial demographic status quo. Since the [*sic*] Chief Stephens's hiring, every vacancy of appointment positions [*sic*] has been filled in this manner.

(Doc. 1 at 2, 3). Plaintiff's allegations, taken in the light most favorable to him as the non-movant, can be construed to allege that the policy in place that "assumed the force of law" was Stephens' unwritten rule that "Chief-level" positions would be filled by applicants of the same race as the person leaving. Stephens would, allegedly, base his recommendations on race alone, and the Mayor would approve Stephens' recommendation without any consideration. However, absent from Plaintiff's allegations – and the record – is any indicia that the Mayor or any other Selma official had actual or constructive knowledge of Stephens' unwritten rule. Instead, it is doubtful

that the Mayor actually listened to Stephens' recommendations.[4] It appears formal protocol was only loosely followed in the Mayor's office.[5] Given these undisputed facts, there can be no

---

[4] Doc. 16-2 at 5:

> Q: Does he review the resumes of current employees when they're candidates for appointment?
>
> A: Doesn't know. I'm not sure. I know what we have done in the past, everyone who actually submits their resumes . . . are actually presented to the personnel department and the personnel department is supposed to make it accessible to the mayor. Now, whether they do or don't, I have no idea about that.
>
> Q: So, with him being out of the loop for the day-to-day operations, not shadowing, having no firefighting experience, no training, do you think he would be able to judge who is the most qualified for the appointment?
>
> A: Well, it would depend on what you're looking for – and the reason why I say that is because he's supposed to be outside the loop. But from some of the things that I've been reading and seeing, apparently, he's not outside the loop. He has his own little comrades that he talks to here and there behind closed doors. So, I don't know what his knowledge level is.

[5] *See* Doc. 16-2 at 4 – 6

> Q: And who makes those appointments?
> A: To be honest, to tell you the truth, with the turmoil they got going on now, your guess is as good as mine. Because they don't even know who's in charge of the position now, whether it's the mayor or whether –
> Q: Who made the appointments in this case?
> [. . .]
> A: To be honest, to tell you the truth, I can't really say because of – it's supposed to be actually made by the mayor and the mayor is supposed to take it before the council.
> [. . .]
> Q: Is that now or has it always been that way? You haven't ever known how the process works?
> A: I know how the process is supposed to work.
> Q: How is the process supposed to work?
> A: The process is supposed to work and stuff whereas actually the mayor is the one that selects, you know, the candidates and supposed to be presented to the council and it's supposed to be jointly an approval.
> Q: As the head of the department there, did you have input into appointments?
> A: I would actually look at the ones that put their application in. And what I would do and stuff is look at their previous record and look at their experience and their time in the company. And then I would say, well, according to these right here, this is the most qualified individual.
> [. . .]
> Q: Would the mayor go with that recommendation since you were the one that's kind of there on ground level?

material question of fact that Selma had no knowledge of any sort of "demographic" promotion rule implemented by Stephens. Moreover, there is no evidence that the Mayor and Stephens were operating in concert. Accordingly, Plaintiff cannot proceed on his Equal Protection claims under this theory of liability.

### C. There is no genuine issue of material fact of any action by Stephens that could be fairly deemed to represent City of Selma policy.

A municipality can be held liable for an official's actions where, *inter alia*, that official's actions are fairly deemed to represent government policy. *Oladeinde,* 230 F. 3d at 1295. However, a government official's actions can only be fairly deemed to represent government policy where that person has "final policymaking authority." *Hernandez v. City of Thomson*, No. CV 113-079, 2016 U.S. Dist. LEXIS 4966, at *7 (S.D. Ga. Jan. 14, 2016). Final policymaking authority

---

A: Yes.
Q: So the mayor would go with your recommendation?
A: Normally he would, yes.
Q: Has there ever been a time where he didn't go with your recommendatoin?
A: . . . I can't clearly say because I'd probably have to have everybody's names wrote down that's been there and promoted under my term.
[. . .]
Q; . . . Will you tell me about the processs? And you kind of started there. But tell me about the process of filling the position and what would happen. Would you give him, I guess, a list of people to pick form? . . . Or would you give him, this is the best and this should be who the appointment should be given to?
A: Actually all the names that's submiutted in there, I would actually just leave everybody in there so that he would have an equal opportunity to pick whoever he want to. And the only thing I would say and stuff at this time, this is the one with the most qualification [*sic*].
Q: So he got to look at everybody?
A: He got to look at everybody.
[. . .]
Q: I understand. I get what you're saying. So you would say here is what the paperwork says is the best and you appoint -- you wouldn't make him -- make the mayor go and figure out which paperwork was the best because maybe he wouldn't know how to do that or would he?
A: Well, I mean, that's pretty much something I leave with them because that's something they're supposed to discuss with the personnel department.

is "a matter of state law to be determined by the trial judge," and such authority cannot be had if one's decisions on a particular issue are "subject to meaningful administrative review**.**" *Doe v. Sch. Bd*., 604 F.3d 1248, 1264 (11th Cir. 2010) (finding no final policymaking authority where school officials' **recommendations could be overruled** by the district superintendent or school board) (emphasis added); *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997) (finding no final policymaking authority where decisions of a city manager and public safety director could be reversed by a city civil service board); *see also Martinez v. City of Opa-Locka*, Fla., 971 F.2d 708, 714 (11th Cir. 1992) (finding final policymaking authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review"); *Hernandez v. City of Thomson*, No. CV 113-079, 2016 U.S. Dist. LEXIS 4966, at *7 (S.D. Ga. Jan. 14, 2016). Where meaningful administrative review is not available, final policymaking authority can be deemed vested in an official where it otherwise would not exist. *Willingham v. City of Valparaiso*, 97 F. Supp. 3d 1345, 1353-54 (N.D. Fla. 2015) ("Imposing a three-day detention, by itself, did not convert the principal into a final policymaker. Had graduation not been looming, Holloman could have employed the review process before serving his detention. This presumably would have stripped the principal of final policymaking authority. However, . . . Holloman could not, 'as a practical matter, take advantage' of the review process without some aspect of the punishment . . . becoming irreversible."). The relevant question here, then, is whether administrative review of Stephens' decisions was available.

**i. Stephens' Recommendations Subject to Meaningful Administrative Review.**

"Final policy making authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review." *Id*. (quoting *Scala*

*v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir.1997)). The opportunity for meaningful review will suffice to divest an official of any policy making authority. See *Id*. 218 F.3d at 1276. It is undisputed that Stephens undertook the following activities when making departmental promotions:

(1) reviewed applicants' submitted materials;

(2) reviewed applicants' disciplinary records and the amount of time they spent with the fire department;

(3) provided each applicant's materials to the mayor;

(4) made recommendations to the Mayor based on how well the candidates' résumés corresponded to the position's requirements and that candidate's disciplinary record.[6]

---

[6] Doc. 16-2 at 4, 5, 7

> Q: As the head of the department there, did you have input into the appointment?
> A: I would actually look at the ones that put their application in. And what I would do and stuff is look at their previous record and look at their experience and their time in the company. And then I would say, well, according to these right here, this is the most qualified individual. [. . .] Actually, all the names that's submitted in there, I would actually just leave everybody in there so that he would have an equal opportunity to pick whoever he want [*sic*] to. And the only thing I would say and stuff at this time, this is the one with the most qualification.
> Q: So, he got to look at everybody?
> A: He got to look at everybody.
> Q: And you say here is the one that I think is the best?
> A: I ain't going to say here is the one that I think is the best. I'm going to say here is the one that's got the most qualification based on time, looking at his previous history, looking at his experience. I'm going to let the paperwork be the one that shows who exactly, you know, has the most qualification. [. . .] I mean, I never put personal feelings into it.
> [. . .]
> A: On the experience part, let's elaborate a little bit on that. And when I say on the experience part, I'm looking at more or less the time that they've been within a department.
> Q: Okay . . . well, you're talking about years?
> A: Yes. I'm talking years. Because I'm not saying experience because of an [*sic*] individual may have rode in a Battalion Chief. [*sic*] . . . So, I never used that

According to the record, Stephens could not remember a time where the Mayor did not follow his recommendation. (Doc. 16-2, *supra* note 5).[7] However, nothing in the record indicates that the Mayor did not make the decisions of his own volition. In fact, the record shows that the Mayor had a chance to see every applicant's information and form his own opinion. (*Id.*). While Plaintiff argues these facts warrant a finding of "cat's paw" liability (*i.e.,* because the Mayor was unable to determine whether a recommended candidate was the most qualified for the position, he relied on Stephens' recommendations [all of which were consistent with his alleged scheme of racial replacement], essentially rubber-stamping those recommendations), the Court does not agree. The Court does not find any question of fact that the Mayor had a full opportunity to review Stephens' recommendations.

---

> because to me that showed bias and stuff. [. . .] So, I used actually the time that they had in the department as a whole.
> [. . .]
> Q: And less disciplinary issues?
> A: Yes.

[7] *See* Doc. 16-2 at 5

> Q: Would the mayor go with that recommendation since you were the one that's kind of there on ground level?
> A: Yes.
> Q: So, the mayor would go with your recommendation?
> A: Normally he would, yes.
> Q: Has there ever been a time where he didn't go with your recommendatoin?
> A: . . . I can't clearly say because I'd probably have to have everybody's names wrote down that's been there and promoted under my term.

### ii. The City's Charter[8]

Selma's City Charter grants the Mayor exclusive authority to make certain appointments. Nothing in the City Charter concerning the Fire Chief's responsibilities state that he or she is authorized to make intra-departmental appointments. The City's Charter, therefore, establishes that Stephens was not authorized to make promotions within the Fire Department. As for custom, Stephens only recommended certain candidates to the Mayor. While Plaintiff insists that this behavior was more insidious, and that Stephens played a larger role in the promotional decision-making chain, the fact is that the Mayor made (and was the only official authorized to make) the appointments at issue. Nothing in the record indicates the contrary. Thus, Plaintiff's claims fail under this theory.

### D. Even assuming Plaintiff may state a *Prima Facie* Case of Discrimination under a "Cat's Paw" theory, Defendant is entitled to Summary Judgment.

Despite the foregoing, Plaintiff insists that he can move forward on his Equal Protection claims by pursuing them under a "cat's paw theory" of liability. According to Plaintiff, Stephens' actions essentially represented government policy because his nomination of "Chief-level" candidates were "rubber-stamped" by the Mayor without any meaningful review. (Doc. 18 at 17, 21 – 24). In response, Selma reiterates that Plaintiff failed to satisfy the necessary prerequisites for carrying his claims (Doc. 19 at 6 – 10) and further argues that Plaintiff's "cat's paw theory" is inapplicable because the Eleventh Circuit does not recognize it as a viable theory of liability. (Doc. 19 at 5).

---

[8] Neither party provided the City Charter to the Court. However, "when analyzing whether a delegation of final policymaking authority has occurred, the Court may examine both the city charter and the customs and practices of [the municipality] with regard to who exercised final authority over the city's employment policies." *Martinez v. Opa-Locka*, 971 F.2d 708, 715 (11th Cir. 1992) (internal citations, parentheses, and quotations omitted).

Under such a theory of liability, the underpinning prejudices of a subordinate's actions adopted by an unwitting superior officer can create municipal liability. About three months before the parties filed dispositive motions in this case, the Eleventh Circuit articulated that a party could proceed with such claims under this theory via an unpublished opinion:[9]

> The cat's paw theory is typically understood to create employer liability under either § 1981 or § 1983 when the employer relies on an improperly motivated recommendation by a subordinate and does not independently investigate the recommendation. Under this theory of liability, an employer found to have acted in a nondiscriminatory manner can still face liability for "rubber stamp[ing]" its employee's discriminatory recommendation. [. . .] ("A decision-maker may serve as the conduit of the subordinate's improper motive, for example, if he merely rubber-stamps the recommendation of a subordinate.").

*Griffin v. City of Jacksonville*, 762 F. App'x 965, 972 (11th Cir. 2019) (internal citations omitted).[10] There, the Eleventh Circuit found the plaintiff's action was not cognizable because he was not subjected to an adverse employment action. *Griffin,* 762 F. App'x 965, 972-73, (". . . cat's paw liability is appropriate only when a person took some sort of action—for example, making a

---

[9] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Rogers v. Secretary, Department of Corrections*, 855 F.3d 1274, 1278 n.1 (11th Cir. 2017) (internal quotes omitted). The Court finds the legal analysis in *Griffin* persuasive.

[10] In *Griffin,* the court noted that the possibility of meaningful review prevented the cat's paw theory from attaching to previous cases:

> In *Quinn*, a former library director sued a county and a county administrator under § 1983 for First Amendment retaliation. The county administrator had the power to both recommend the library director's termination and terminate her. And her termination was reviewable by the county's Career Services Council. This Court held the county was not subject to municipal liability because the county administrator's acts were reviewable by the Career Services Council, but the county administrator could be individually liable for his recommendation and termination of the library director under § 1983.

*Griffin v. City of Jacksonville*, 762 F. App'x 965, 972 (11th Cir. 2019).

termination recommendation—that led to the adverse action against the plaintiff"). Here, however, Plaintiff's allegations fit the necessary criteria.

It is undisputed that Edwards, as an African American man, is a member of a protected class. *Maddox-Jones v. Bd. of Regents of Univ. Sys.*, 448 F. App'x 17, 20 (11th Cir. 2011). It is further undisputed that Edwards applied for the following positions: (1) Battalion Chief in 2016; (2) Assistant Chief in 2017; and two Battalion Chief positions that became available in 2018. (Doc. 1 at 3).[11] Each job posting required the following qualifications: a bachelor's degree with five years' experience in the Fire Department, or, as a substitute for educational experience, requisite experience and rising leadership roles in the *Fire Department*. (Doc. 16-12 at 24; Doc. 16-4 at 16) (emphasis added). In this respect, Plaintiff met the minimum requirements for the departmental postings. It is further undisputed that Plaintiff was denied these positions and that at least two of these positions were filled with persons outside Plaintiff's protected class.

However, even assuming Plaintiff may state a *prima facie* claim for discrimination under a "cat's paw theory," Defendant is entitled to summary judgment because it has demonstrated legitimate, non-discriminatory reasons for refusing to promote or recommend Plaintiff for a "Chief-Level" position, and plaintiff has failed to provide sufficient evidence to demonstrate those reasons are pretextual.

Selma's proffered reasons for failing to recommend or promote Plaintiff to a "Chief-level" position include that applicants who received recommendations and promotions had been with

[11] As noted in Defendant's Motion for Summary Judgment, at the time Plaintiff applied for each "Chief-level" position, he was not a resident of Dallas County, Alabama. The record reflects that, at the times Plaintiff applied for each position, the City required all "Chief-level" appointed positions in the Selma Fire Department to be residents of Dallas County, Alabama. (Doc. 16-10 at 189; Doc. 16-14). Excluding this particular residency requirement for the time being, the Court shall assess whether Edwards has demonstrated a *prima facie* case for discrimination for the 2016 and 2017 postings.

the Fire Department longer than Plaintiff and had fewer disciplinary infractions. (Doc. 16 at 3, 4). Selma has presented evidence that each candidate who received a "Chief-level" recommendation and promotion was with the Fire Department longer than Plaintiff and/or had fewer disciplinary infractions than Plaintiff.[12] Seniority and disciplinary history are legitimate non-discriminatory reasons for Stephens' recommendations for promotion. *Hernandez v. MARTA*, No. 1:08-CV-1852-TCB-CCH, 2010 U.S. Dist. LEXIS 149334, at *64 (N.D. Ga. July 21, 2010) (finding one year of senior level experience and fewer disciplinary actions as sufficient evidence of legitimate non-discriminatory reasons for promotions); *Humphrey v. Kroger Co.*, Civil Action No. 1:07-CV-00310-JEC, 2008 U.S. Dist. LEXIS 131533, at *47 (N.D. Ga. July 3, 2008) (finding legitimate non-discriminatory reasons for demotion where plaintiff received, *inter alia*, negative performance memoranda and negative performance evaluations, a 3-day suspension without pay, and a final 30-day probationary period); *Hanford v. GEO Grp., Inc.*, 345 F. App'x 399, 403 n.4 (11th Cir. 2009) (finding appellant's argument that he received disparate treatment when examining comparators faulty because, *inter alia*, appellant had at least three disciplinary actions while most other employees identified by him were first-offenders); *Veasy v. Sheriff of Palm Beach Cty.*, 746 F. App'x 816, 819 (11th Cir. 2018) (finding "a long line of insubordination offenses" as a legitimate, non-discriminatory reason for an adverse employment action).

In an attempt to show that Selma's proffered non-discriminatory reasons for the challenged actions were merely pretextual, Plaintiff points the Court's attention to Stephens'

---

[12] Plaintiff's disciplinary infractions comprise Doc. 16-4 at 16, 17, 22 – 25, 47 – 51, 55, 79, 80, 83, 84, 95, 106, 109, 110, 113, 117, 118, 128, 129, and 156, 157. A complete record of Plaintiff's disciplinary record from 2002 to 2011 is included in Doc. 16-4 at 162. The disciplinary records of the firefighters [Christopher Horton and Christopher Graham] who were promoted to the two positions at issue, Battalion Chief [2016] and Assistant Fire Chief [2017], are included in Doc. 16-8 and Doc. 16-10 at 38, 117, 127, 162, 176, 190, and 192, respectively.

alleged pattern of discriminatory recommendation procedures, *i.e.,* recommending white candidates to "Chief-level" positions where the person leaving was white. (*See generally,* Doc. 1). Plaintiff also points to inconsistencies in the promotional process generally (*e.g*., whether the Mayor actually reviewed former Chief Stephens' recommendations and whether the Mayor was actually the best official to review those recommendations, etc.). (Doc. 18 at 23). Plaintiff also offers an affidavit that states, *inter alia,* "[f]ormer Chief Toney Stephens had a policy which he verbalized in my presence of promoting 'white for white' and 'black for black' when a vacancy arose." (Doc. 18-1 at 1).[13] These offerings are insufficient to show pretext.

The pattern of promotions within the department under Stephens' tenure is relevant to demonstrating pretext. *Harrington*, 276 F. App'x at 871-72 (". . . pattern and practice may be relevant to a claim of pretext in a private individual's case of discrimination . . ."). However, where members of the same protected class as a plaintiff are promoted during the time period where a plaintiff was not promoted, the Court should treat such evidence as a strong indication that an aggrieved party's non-promotion was not based on discrimination. *Harrington,* 276 F. App'x at 873 (11th Cir. 2007) ("the decision was not racially motivated because three other African-Americans servers were promoted to trainer around the time Hardin applied**.** This is

[13] Plaintiff also insists that Stephens' refusal to consider an applicant's leadership experience outside the Fire Department shows pretext. (Doc. 18 at 24). This argument is unpersuasive because Plaintiff has failed to offer evidence that refusal to consider such qualifications was done in order to perpetuate racial discrimination. *See Ogletree v. City of Auburn*, 619 F. Supp. 2d 1152, 1169–70 (M.D. Ala. 2009) ("Plaintiffs do not get to pick and choose the City's criteria for awarding promotions, and to the extent that they ask this court to do so for the City, Plaintiffs essentially are asking for a federal court review of the City's personnel decisions. Plaintiffs must instead offer evidence that the City's decision . . . was for a racially discriminatory reason.").

strong evidence that the decision not to promote Hardin was not the result of racial discrimination.”).

As noted in Edwards Complaint, at least one other African American man was promoted to a “Chief-level” position when Plaintiff applied for “Chief-level” positions. (*See* Doc. 1 at 3).[14] While this alone is not demonstrative of a lack of pretext, it certainly suggests that these recommendations were not motivated by racial animus.[15] This leads the Court to its next set of issues: whether it must accept Plaintiff’s affidavit and whether Plaintiff is held to a higher standard because he, Stephens, and the Mayor of Selma, Darrio Melton, are members of the same protected class.

**i. Plaintiff’s Affidavit**

Selma argues that the Court should disregard Plaintiff’s affidavit because it is a “sham,” relying on *Van T. Junkins & Assocs., Inc. v, U.S. Indus., Inc.,* 736 F.2d 656 (11th Cir. 1984). Selma asserts Plaintiff cannot rely upon his affidavit because the record evidence shows Plaintiff’s

---

[14] Doc. 16-1 at 3

> Q: . . . Are you only suing because the white guy got the position?
> A: You said only because? No. I’m suing because I wasn’t – I feel as though I wasn’t given a fair and equal opportunity.
> Q: And we’re going to get to it, but there’s two positions for battalion chief in 2016. One went to a white guy and one went to a black guy; is that correct?
> A: That’s correct.
> Q: I want to talk about the position that went to Murphy, the black guy.
> A: Okay.
> Q: You’re saying that you were more qualified than he was, correct?
> A: That’s correct.
> Q: But your complaint only mentions Horton, the white guy. Are you not suing the City of Selma because Murphy got a position and you thought you were more qualified than he was?
> A: No. I feel I was more qualified than both.

[15] This case differs slightly from *Harrington*, as only one other member of Plaintiff’s protected class was promoted during the time Plaintiff applied for promotions.

affidavit contains unexplained, and thus impermissible, expanded testimony. Selma further argues that the record evidence (excluding Plaintiff's affidavit) shows that Stephens only voiced his intent to maintain a diverse department through hiring and recruitment and his promotional recommendations were not based in discrimination or racial bias. (Doc. 19 at 9).

After *Van T. Junkins*, the Eleventh Circuit provided some greater guidance on when a court may properly disregard an affidavit as a "sham." In *Lane v. Celotex Corp.*, 782 F.2d 1526, (11th Cir. 1986), that court reiterated that "a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition" and only when "clear and unambiguous" answers are provided in prior testimony may a contradictory affidavit created thereafter be disregarded. *Id.* at 1529 – 30. However, a plaintiff may not avoid summary judgment by disputing his own admissions. *See, e.g.*, *Calvo v. B&R Supermarket, Inc.*, 63 F. Supp. 3d 1369, 1372 (S.D. Fla. 2014) (Bloom, J.) (disregarding plaintiff's declaration where it contradicted her deposition testimony and "consist[ed] in large part of self-serving statement and opinions otherwise unsubstantiated by the record before the [court]"). Moreover, this Circuit's case law requires the Court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit. *Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306, 1316 (11th Cir. 2007).

Plaintiff's affidavit is sparse. Plaintiff's deposition testimony regarding Stephens' alleged discriminatory practices is equally brief. During his deposition, Plaintiff provided the following about his knowledge of those alleged practices:

> Q: Okay. You mentioned a statement that the positions were going to be replaced by the race that left the position I think is what you said; is that correct?
> A: Yes.

> Q: Who made that statement?
> A: Chief Stephens.
> Q: When was the statement made?
> A: I don't recall the date, but we were standing outside – we was adjacent to Station 3 in the parking lot.
> Q: Do you remember when?
> A: I just stated I don't know when.
> Q: Do you remember the year?
> A: 2016.
> [ . . .]
> Q: Do you remember the exact statement?
> A: The exact statement? No, I can't remember the exact statement.
> Q: Can you give me the best you've got on it?
> A: I believe we're going to keep the demographics the same was what I believe he said.

(Doc. 16-1 at 3, 4). The questions and answers from Plaintiff's deposition are clear and unambiguous. When specifically asked about what Stephens said regarding his alleged discriminatory scheme, Edwards could not recall the exact content of that statement. Instead, he only remembered that Stephens allegedly said "demographics [would be kept] the same." Edwards did not refer to which demographics, *e.g.,* new hires, intermediate promotions, or "Chief level" promotions, would be kept the same. Now, in his affidavit, Plaintiff states that Stephens said explicitly that "white[s] [would be promoted] for whites" and "black[s] for black[s]."

While Plaintiff might argue that because he previously testified that Stephens told him that demographics would to be kept the same, and that the statement encompassed demographics concerning promotions, thus leaving him some room to expand his testimony, this is not persuasive. Plaintiff unambiguously stated that he could not remember what Stephens said while they were in the parking lot adjacent to Station 3. Now however, without explanation, he testifies that he does remember what was said. This is not an expansion, but a change from

an affirmative statement of no memory to a contradictory statement of a very specific memory without any justification. In short, Plaintiff, without equivocation, stated he could not remember what Stephens said regarding his alleged promotional scheme during his deposition, and now, without any justification, he provided the Court with a contradictory and expansive statement. This sort of inconsistency without explanation or justification is impermissible. *Allen*, 495 F.3d 1306, 1316. Accordingly, in light of Plaintiff's previous clear and unambiguous testimony and his contradictory statement put forward without any explanation or justification, the Court finds Plaintiff's affidavit is a "sham."[16]

**ii. Plaintiff's Burden**

Selma also argues that Plaintiff faces a greater burden at this stage in the proceedings because he, Stephens, and Mayor Melton are members of the same protected class. (Doc. 19 at 6). Selma relies on *Moore v. Ala. Dep't of Corr.,* 137 Fed.App'x 235, 239 n. 4 (11th Cir. 2005) (". . .Where decision-makers are also members of a protected class, the plaintiff faces a greater burden."). *Moore* was also a discrimination case. There, the plaintiff alleged that he was demoted as a result of racial animus. Affirming the district court's grant of summary judgment against Moore, that court noted that, "[w]here decision-makers are also members of a protected class, the plaintiff faces a greater burden." *Moore, 137* Fed.App'x. at 239 n. 4. In making its

[16] While Plaintiff may argue that *Celotex* works in his favor, it does not. There, the Eleventh Circuit found statements made by a disinterested witness during his deposition were neither clear nor unambiguous. Further, that court found that the Plaintiff's affidavit, which contained expanded testimony, was not a "sham" because his deposition testimony did not "foreclose" such expansion. In other words, his deposition testimony allowed for some wiggle room and his affidavit took advantage of that space. There is no such wiggle room here based on Plaintiff's deposition testimony. The Court also notes that this is not a "character determination" – an issue properly resolved before the jury. *See e.g., Jones v. City of Heflin,* 207 F. Supp. 3d 1255, 1263 n. 8 (11th Cir. 2016). Rather, the issue here is whether Plaintiff's unexplained and contradictory testimony should be considered a "sham."

determination, the Eleventh Circuit relied on its earlier decision in *Elrod v. Sears, Roebuck & Co*., 939 F.2d 1466 (11th Cir. 1991). In *Elrod*, that court, like the *Moore* court, upheld a district court's grant of summary judgment against a plaintiff alleging discrimination, though on the basis of age. In affirming the district court's decision, the court noted, "[plaintiff] faces a difficult burden here, because all of the primary players behind his termination . . . were well over age forty and within the class of persons protected by the ADEA. These three are more likely to be the victims of age discrimination than its perpetrators." *Elrod,* 939 F.2d, at 1471. Plaintiff finds himself in a situation similar to those plaintiffs above. He is, as those parties were, members of the same protected class as those he alleged perpetrated a discriminatory scheme against him. Accordingly, Plaintiff faces a higher burden in this matter.

**III. DEFENDANT IS DUE SUMMARY JUDGMENT ON PLAINTIFF'S DUE PROCESS CLAIM.**

In his final claim, Plaintiff asserts that his Fourteenth Amendment Due Process rights were violated as a result of an eight-shift suspension he received on April 12, 2018. (Doc. 1 at 4). Plaintiff alleges the following procedural Due Process rights: (1) he was not afforded a hearing to contest his suspension prior to its imposition; and (2) this suspension violated his right to uninterrupted employment and his property right to his lost wages. (*Id.*). Plaintiff also asserts that this suspension was "unjust." (*Id.*).

Selma correctly asserts that Plaintiff's claim here should only be understood as a procedural due process issue because, "[a]n employee with a property right in her employment is entitled to certain procedures but not to any substantive rights under the Due Process Clause."

(Doc. 16 at 21) (relying on *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994)).[17] In its Brief, Selma argues that it is due summary judgment because Plaintiff received all the process he was due.[18] Specifically, Selma asserts that Plaintiff's two suspensions (one for five days, the second for three), did not mandate a hearing because: (1) Plaintiff's "property at issue here is a finite suspension of less than ten days" and therefore, "*de minimis*" (*Id.* at 23); and (2) because the Fire Department's policies limit the availability of hearings to those more than five days for a singular offense, or ten in the aggerate of multiple offenses. (*Id.* at 23) (relying on *Gibson v. City of Gadsden, Ala.,* 377 F. App'x 953, 956 (11th Cir. 2010)). Finally, Selma argues that Plaintiff's Due Process claim must fail because Plaintiff has not alleged that the City's policies or customs caused the deprivation of his federal rights and that Plaintiff has not shown that the City's deliberate conduct was the moving force behind his alleged injury. (*Id.* at 24).

Edwards agrees with several of Selma's assertions and clarifies his stance on his due process claim. (Doc. 18 at 29). Edwards disagrees, however, with Selma's assertion that he was not entitled to a hearing. Instead, Plaintiff argues that his two suspensions that were imposed without a hearing – allegedly arising from the same conduct – did not comport with "the requirements of due process." (*Id*. at 30).[19] In response, Selma effectively re-raises the arguments made in its Brief in Support, asserting that Plaintiff:

---

[17] *See also Dejarnett v. Willis*, 976 F. Supp. 2d 1271, 1294 (M.D. Ala. 2013) (". . . public employment is no longer subject to substantive due process protection.").

[18] Selma also argues that it is due summary judgment because Plaintiff failed to invoke the proper statutory provision necessary to advance this claim. (Doc. 16 at 21). This argument is nearly identical to that raised by Defendant concerning Plaintiff's Equal Protection and failure to promote claims, though Selma cites no case law to support this proposition in either of its briefs.

[19] Here, Plaintiff also relies on *Dejarnett v. Willis*, 976 F. Supp. 2d 1271, 1294 (M.D. Aa. 2013).

(1) alleged that former Chief Stephens failed to properly follow City policy, not that Selma's policy is responsible for Plaintiff's injuries;

(2) failed to challenge or identify a municipal policy of custom causing the deprivation of his federal rights; and

(3) failed to show that the City's "deliberate conduct" was the "moving force" behind his alleged injury

(Doc. 19 at 11).

Procedural Due Process claims brought under 42 U.S.C. § 1983 are subject to limitations in the context of municipal liability. *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016).[20] Municipal liability under § 1983 obtains only where "the municipality has officially sanctioned or ordered" the constitutional violation at issue. *Id.* A municipality may be liable for an official policy enacted by its legislative body, or where its policymakers have acquiesced in a longstanding standard operating procedure, or where an entity with "final policymaking authority" ratifies the unconstitutional decision of a subordinate. *Id.* (internal quotation marks omitted). Although a plaintiff need not identify a final policymaker at the pleading stage, a plaintiff must "allege a policy, practice, or custom of the [municipality] which caused" the constitutional violation. *Oden, LLC v. City of Rome*, 707 F. App'x 584, 586-87 (11th Cir. 2017). Municipalities are not subject to liability on a *respondeat superior* theory. *Id*. Municipalities can be held liable only if the unconstitutional action implements an official municipal policy or is pursuant to a governmental custom. *Card v. Miami-Dade Cty.,* 147 F. Supp. 2d 1334, 1343 (S.D. Fla. 2001). Municipal liability may also be imposed when the absence of a policy establishing

[20] Here, the Court assumes without finding that Plaintiff brought these claims under 42 U.S.C. § 1983. However, as Defendant correctly points out, such a designation is absent in Plaintiff's pleading.

appropriate procedures to ensure against violation of a person's constitutional rights results in a violation of those rights. *Card v. Miami-Dade Cty.,* 147 F. Supp. 2d 1334, 1343 (S.D. Fla. 2001).

Edwards has failed to allege, argue, or provide any support to the notion that Selma has an active or "passive" policy that allowed Stephens to "mete out" punishment in a way that violated Plaintiff's Due Process rights. Instead, Plaintiff's allegations include (and the record supports) that he was suspended by Stephens on two occasions based on a single instance of conduct that comprised two separate violations. (*See* Doc. 16-16). Plaintiff alleges in his Complaint and Brief in Opposition that "[he] was not allowed to have a hearing to contest the suspension" and that "the evidence discloses that this alleged policy violation was artfully manipulated to impose a suspension . . . of eight (8) days for a singular offense without providing a hearing for what was a singular offense." (Doc. 1 at 4; Doc. 18 at 30). Absent entirely from Plaintiff's allegations is anything related to a policy or custom *Selma* had in place. Rather, Plaintiff appears to want to hold Selma vicariously liable for Stephens' actions. This, Plaintiff cannot do. *Oden, LLC,* 707 F. App'x 584, 586-87 (11th Cir. 2017). Accordingly, Plaintiff's Due Process claim fails as a matter of law.

**CONCLUSION**

Plaintiff finds himself at the summary judgment stage of proceedings where there is sufficient evidence to show that those who allegedly discriminated against him did not act with any sort of racial animus. Further, Plaintiff has not provided significantly probative evidence that the proffered reasons for non-promotion were merely pretextual, and Plaintiff has not provided any evidence suggesting that Selma violated his Due Process rights when Stephens suspended

him. Accordingly, the Court **grants** Defendant's motion and finds that it is entitled to summary judgment on all claims.[21]

**DONE and ORDERED** this 24th day of October, 2019.

/s/ JEFFREY U. BEAVERSTOCK
UNITED STATES DISTRICT JUDGE

[21] This includes Plaintiff's Equal Protection and § 1981 claims brought pursuant to § 1983. "The Eleventh Circuit has held that § 1983 may be used as a parallel remedy to Title VII for race discrimination which violates the Equal Protection clause of the Fourteenth Amendment. Thus, in a § 1983 intentional discrimination suit based on circumstantial evidence, the plaintiff has the burden of establishing a *prima facie* case by a preponderance of the evidence." *Dejarnett v. Willis*, 976 F. Supp. 2d 1271, 1292 (M.D. Ala. 2013).